# IN THE COURT OF APPEALS OF IOWA

No. 21-0973
Filed July 20, 2022

FLANAGAN CORPORATION, d/b/a TIM FLANAGAN'S RESTAURANT AND LOUNGE, and TIMOTHY FLANAGAN,
        Plaintiffs-Appellants,

**vs.**

LAKE CABIN PARTNERS, LLC, LEW BOLTON, CYNDIE BOLTON, and PETER S. CANNON,
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.


        A dissolved corporation and an individual appeal the district court's rulings on claims of fraudulent conveyance. **AFFIRMED**.


        Matthew M. Sahag and Angela L. Campbell of Dicky, Campbell & Sahag Law Firm, Des Moines, and Megan C. Flynn of Coppola Law Firm, West Des Moines, for appellants.

        Fred L. Dorr of Wasker, Dorr, Wimmer & Marcouiller, P.C., West Des Moines, for appellees.


        Heard by Bower, C.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

After prevailing against Peter Cannon in a separate action, Flanagan Corporation (the Corporation) and Timothy Flanagan (Flanagan) instituted the current proceeding, alleging fraudulent transfers in violation of Iowa Code chapter 684 (2019). The Corporation contends the court wrongly dismissed the Corporation from the proceedings because it was administratively dissolved. Flanagan appeals the district court's denial of his motion for default judgment against Cannon. The Corporation and Flanagan appeal the district court's ruling that found Lake Cabin Partners, LLC (LCP) and its three members, Lew and Cynthia Bolton (the Boltons) and Cannon, did not fraudulently transfer funds from LCP to Cannon and that Cannon did not fraudulently convey his interest in LCP to the Boltons. Flanagan also claims the district court wrongly denied his requests for punitive damages and attorney fees.

We agree with the district court's dismissal of the Corporation from the proceedings and the denial of Flanagan's motion for default against Cannon. On our de novo review, we find Cannon and the Boltons did not fraudulently convey funds from LCP, nor did Cannon fraudulently convey his interest in LCP to the Boltons. The district court properly denied the request for punitive damages and attorney fees. Accordingly, we affirm.

I.      **Background Facts & Proceedings**

Cannon and Cynthia were married for about thirteen years. They divorced in 1994. They maintained a relationship following the divorce, in part for the benefit of their two children. Cynthia married Lew Bolton in 1997. Cannon, an attorney, had significant financial troubles since his separation from Cynthia, including

numerous federal and state tax liens from 1998 until 2017. He was consistently delinquent in child support payments owed to Cynthia. Cannon's property was foreclosed on in 2015. Cannon was also delinquent in the payment of his son's college loans.

Cannon purchased two properties in Okoboji in 2012. He acquired the properties, known as 1001 and 1003 Lake Street, under his single-member limited liability company, MFG Iowa. In order to finance the purchase, Cannon obtained a loan from Citizens State Bank (CSB). As part of the loan, CSB obtained an appraisal that valued the two properties together at $385,000.00. The appraisal noted that the smaller cabin at 1001 Lake Street did not contribute significantly to the value of the property and valued that cabin at $4000.00.

Cannon and the Boltons formed a limited liability company, LCP, on January 4, 2014. The loan officer at CSB testified that he believed Cannon engaged the Boltons with the Okoboji properties because Cannon was struggling to pay the loans and the bank wanted stronger financial partners. Both Cannon and the Boltons acquired a fifty percent interest in LCP by contributing $100.00 to the company. Shortly after LCP was formed, Cannon conveyed the two lakefront properties to LCP from MFG Iowa. To refinance the loan from CSB, Cannon and the Boltons each paid $10,000.00 to the bank. LCP's membership agreement indicated that the Boltons and Cannon would each be responsible for fifty percent of the expenses incurred by the company. For the next two years, expenses for

LCP were paid from Cannon and the Boltons' personal bank accounts, although the Boltons paid most of the expenses.[1]

LCP sold 1001 Lake Street in September 2016. The company opened a bank account and deposited the proceeds of approximately $160,000.00 from the sale the same month. Between the opening of the bank account in September and the end of 2017, Cannon withdrew money for personal expenses seven times. Each withdrawal was made as a loan that Cannon promised to repay. At the end of 2017, Cannon had $9000.00 in unmatched equity withdrawals compared to the Boltons. LCP's bank account was effectively depleted by this time.

Flanagan initiated a lawsuit against Cannon on December 14, 2016, alleging malpractice by Cannon during his legal representation of Flanagan concerning the sale of a bar. Throughout the litigation, Cannon maintained to the Boltons that he was confident he would prevail. Following a jury trial in September 2018, contrary to Cannon's predictions, a jury awarded Flanagan about $355,000.00. The district court later awarded Flanagan roughly $110,000.00 in attorney fees.

Cannon continued to struggle to pay his share of expenses of LCP. Because of Cannon's inability to assist in the payment of those expenses, he orally agreed to sell his interest in LCP to the Boltons in January 2018. The sale of membership certificate was completed either around Easter or in June 2018, although the certificate was backdated to reflect the agreement was reached in

---

[1] The Boltons paid nearly $60,000.00 in expenses, while Cannon paid about $10,000.00.

January.[2]  As part of the sale, the certificate noted that "the debts and obligations due exceed the value of the assets of LCP."  The Boltons paid $10.00 for Cannon's interest in LCP.

Following Cannon's transfer of his interest in January, he remained involved with LCP to assist the Boltons in renovating the 1003 Lake Street property.  The Boltons testified that this was necessary so Cannon could connect them with local contractors and other individuals involved with the renovation.[3]  The extent of Cannon's involvement after the transfer of his interest in LCP was contested at trial.

Flanagan filed the instant petition on April 9, 2019.  He alleged Cannon's transfer of his interest in LCP and the equity withdrawals were fraudulent in that they were an attempt to reduce the assets available to Flanagan to collect his judgment.  The Boltons answered the petition and filed an accompanying motion to dismiss, which was denied.  Flanagan subsequently amended the petition in August and moved for an entry of default against Cannon.  The court denied the motion for default, citing a typographical error in the notice of intent to enter default. The court ultimately found the matter moot in the final ruling.  Following a three-day trial, the district court denied all of Flanagan's claims.  Flanagan Corporation and Flanagan appeal.

---

[2] The June agreement contained an additional paragraph not present in the original agreement.

[3] Ultimately, the cabin was torn down and a new structure was built in its place.

## II.    Standard of Review

"A decision to grant or deny a motion for default judgment rests in the sound discretion of the trial court.  Reversal is only warranted upon a finding that the court's discretion has been abused." *Jack v. P & A. Farms, Ltd.*, 822 N.W.2d 511, 515 (Iowa 2012) (internal quotation marks and citation omitted).  We review a court's decision on punitive damages for an abuse of discretion.  *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 395 (Iowa 2010).  We review an award of common-law attorney fees de novo.  *Wolf v. Wolf*, 690 N.W.2d 887, 896 (Iowa 2005).

The parties disagree on the applicable standard of review for actions involving voidable transactions under Iowa Code chapter 684 (2019).  We recognize that cases arising under chapter 684 have been brought as an equitable action or as an action at law.  *See, e.g.*, *Johnson v. Ventling*, No. 13-0157, 2014 WL 1714966, at *1 (Iowa Ct. App. Apr. 30, 2014) (noting the lawsuit was brought as a law action and was therefore reviewed for correction of errors at law); *Kohrs-Manriques v. Brown*, No. 17-1360, 2019 WL 141007, at *1 (Iowa Ct. App. Jan. 9, 2019) (finding that the case was tried in equity and the proper standard of review was de novo).  Because our conclusion is the same under either standard, we review the action for voidable transactions de novo.  "We give weight to the district court's factual findings, but are not bound by them."  *Schaefer v. Schaefer*, 795 N.W.2d 494, 497 (Iowa 2011).

## III.    Dismissal of Flanagan Corporation

Flanagan contends the district court wrongly dismissed the Corporation from the litigation.  The Corporation was administratively dissolved in August 2012.

The district court found that because the Corporation had lost the right to use its corporate name five years after dissolution, pursuant to Iowa Code section 490.1422(2)(b)(2), it also lost the ability to bring suit under the same name. The district court dismissed Flanagan Corporation from the proceedings, and it also determined that the Corporation would have lost on the merits of the case.

We agree with the district court's conclusion concerning the dismissal, but on a slightly different basis than relied on by the district court. Iowa Code section 490.1421(3) provides that "[a] corporation administratively dissolved continues its corporate existence but shall not carry on any business except that necessary to wind up and liquidate its business and affairs under section 490.1405 and notify claimants." Thus, an administratively dissolved corporation is limited in what activities it can engage in to those concerning the winding-up of a business. As Flanagan points out, section 490.1405(2) reads, "Dissolution of a corporation does not . . . [p]revent commencement of a proceeding by or against the corporation in its corporate name." However, that section does not alter the type of conduct that corporations are limited to under section 490.1421. Instead, it merely clarifies that litigation may be used even after dissolution, subject to the section 490.1421 restriction that any activity—including litigation—is necessary to wind-up the business. Thus, contrary to the district court's interpretation involving the use of a corporate name five years after dissolution, an administratively dissolved corporation cannot pursue litigation unrelated to winding-up post-dissolution.

The Corporation was administratively dissolved in 2012. But Flanagan testified that he did not move to reinstate the corporation because he sold the business associated with it. The record does not reflect creditors have been

notified or that other activities associated with winding-up a business occurred. Nor does the record reflect that the instant litigation was intended to assist the winding-up process. Instead, the litigation is solely related to attempts to enforce a judgment. The Corporation cannot engage in this lawsuit and the district court properly dismissed it from the case.

## IV. Cannon Default

Flanagan alleges the district court improperly denied his motion for judgment of default against Cannon. The district court initially denied the motion because Flanagan's notice of intent to Cannon contained a typographical error. The court also noted, "[T]his court can only find Peter Cannon to be in default . . . as to further proceedings and cannot address the judgments and remedies sought due to their intertwining with the claims against the remaining Defendants who have answered."[4] Flanagan corrected the typographical error and resubmitted a notice of intent to Cannon. The district court found the motion for default moot in its final ruling because it ruled against Flanagan on the merits.

The United States Supreme Court has explored the difficulty of granting a motion for default against one defendant while the proceedings continued against another in cases involving joint fraud. In *Frow v. De La Vega*, the Court noted that granting default as to one defendant could result in contradictory decisions, with one finding of joint fraud and one dismissing the complaint. 82 U.S. 552, 554 (1872). The court explained the proper procedure in such cases:

> The true mode of proceeding where a bill makes a joint charge against several defendants, and one of them makes default, is simply

---

[4] The court also noted that Cannon could only default as to the original petition because he was not served with the amended petition.

to enter a default and a formal decree *pro confesso* against him, and proceed with the cause upon the answers of the other defendants. The defaulting defendant has merely lost his standing in court. He will not be entitled to service of notices in the cause, nor to appear in it in any way. He can adduce no evidence, he cannot be heard at the final hearing. But if the suit should be decided against the complainant on the merits, the bill will be dismissed as to all the defendants alike—the defaulter as well as the others.

*Id.* (emphasis in original).

The reasoning of *Frow* is compelling in this case. Given the absurd result that may follow an entry of default against Cannon but not the Boltons, we find the district court did not abuse its discretion in denying the motion for default against Cannon.

## V.    Fraudulent Transfers & Buy-Out

Flanagan seeks to void the transfer of Cannon's interest in LCP to the Boltons and the roughly $50,000.00 of loans Cannon took from his equity interest in LCP, asserting the transactions were fraudulent. In particular, he alleges the transactions were done with the actual intent to defraud him and were done without the Boltons receiving a reasonable equivalent value in exchange for the transfers. *See* Iowa Code § 684.4(1)(a)-(b).

Iowa Code section 684.4(2) sets out a non-exhaustive list of several so-called "indicia of fraud" to be used when determining whether a transfer was made with actual intent to defraud a creditor:

a. The transfer or obligation was to an insider.
b. The debtor retained possession or control of the property transferred after the transfer.
c. The transfer or obligation was disclosed or concealed.
d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
e. The transfer was of substantially all the debtor's assets.
f. The debtor absconded.

g. The debtor removed or concealed assets.

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

j. The transfer occurred shortly before or shortly after a substantial debt was incurred.

k. The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

While we consider all relevant facts when determining whether actual fraud occurred, the creditor seeking to void a transaction bears the burden of proving fraud by a preponderance of the evidence. Iowa Code § 684.4(3).

A few indicia suggest the transactions were done with an actual intent to defraud Flanagan. First, the transfers to and by Cannon involved insiders to LCP. *See* Iowa Code § 684.1(8) (defining insider). Before the transfer of his interest in LCP and before a few of the withdrawals from LCP, Cannon had been sued by Flanagan. Cannon has absconded, apparently living in another state. And Cannon was insolvent, or very nearly insolvent, throughout his dealings with LCP. He remained somewhat involved with LCP and the Boltons, continuing to communicate with some entities involved with the renovation of the 1003 Lake Street property. Some factors weigh in Flanagan's favor.

Despite those factors, stronger evidence suggests the transfers were not intended to defraud Flanagan. First, Cannon had been transferring money from LCP to himself before Flanagan filed his petition—four transfers, totaling about $27,500.00, or half of the transfers Flanagan contends were fraudulent, were completed before the litigation began. Cannon's conduct tracks his long history of financial difficulties. As a result, the transfers are more consistent with Cannon

trying to keep his head above water than with an attempt to hide assets from a lawsuit that had not even begun. Nor were the transfers concealed. For instance, the bank employee in charge of the loan to LCP knew the Boltons had bought Cannon's interest in the properties in February 2018, less than one month after Cannon and the Boltons orally agreed to the transfer. And while Cannon stayed somewhat involved in the properties following the transfer of his interest in LCP— he continued to email individuals working on the 1003 Lake Street property and left personal affects there—a similar amount of correspondence by the Boltons indicates that Cannon had no control over the property. At best, the emails that include Cannon indicate that Cannon continued to assist the Boltons, not that he had any claim to the property.

Additionally, transferring Cannon's interest in LCP was made for a reasonable equivalent value.[5] The district court relied on a real estate agent's valuation of the 1003 Lake Street property at $275,000.00.[6] After subtracting the existing loan debt, which had $227,800.00 outstanding, LCP had a $47,200.00 value. Half of that value, which per the LCP operating agreement was Cannon's share, was $23,600.00. However, Cannon's equity interest was lower than that value due to $9000.00 he owed the Boltons for covering operating expenses, almost $7000.00 in a promissory note Cannon owed Cynthia, and about

---

[5] For the same reasons as explained here, Flanagan's claim that the transfer was fraudulent because of the lack of reasonable equivalent value fails. *See* Iowa Code § 684.4(1)(b).

[6] The Boltons also suggest the value should be lower, at around $250,000.00. Since Cannon had a negative equity interest under either value, we use the higher estimate for the property's fair market value.

$29,000.00 Cynthia took on from Cannon involving their son's college debt.[7] Thus, Cannon had a negative equity interest of about $21,000.00. Accordingly, the Boltons' transfer of $10.00 for Cannon's interest in LCP was a reasonable equivalent value—if anything, they overpaid.

Transferring Cannon's interest in LCP reflects his and the Boltons' tenuous financial position in early 2018. While the Boltons were generally aware Cannon was being sued, Cannon consistently expressed confidence in the outcome. LCP's bank account was empty. Cannon was significantly behind on paying his fifty percent share of expenses, and knew that he would have personal expenses— some of which related to paying his attorneys for the Flanagan litigation—mounting steadily. Cannon had no equity left in LCP, which is reflected in the sale of membership certificate that notes, "the debts and obligations due exceed the value of the assets of LCP." As explained above, LCP had positive equity, but Cannon did not. Bolton's intent was not to defraud Flanagan, but to cut their losses regarding Cannon's debt.

This conclusion is reinforced by Flanagan's own testimony. When asked what evidence he had suggesting the Boltons were aware of his lawsuit against Cannon, he explained that "[he] was assuming that all the time they spend together at the lake, [he] was assuming [the lawsuit] would have come up." He also testified that the Boltons were never parties to the litigation in any way. He conceded that

---

[7] During oral arguments, Flanagan argued that the promissory note between Cynthia Bolton and Cannon, the debt Cannon owed Cynthia for child support, and the student loan debt should not be considered as such were not contained in the LCP sale agreement. Even if we were to redact those figures from the equation, such does not alter our determination that the transfer was made for a reasonable equivalent value.

after sitting through the whole trial, he could not point to any evidence suggesting that Cannon was trying to hide money from him.[8]  When explaining the basis for this lawsuit, he opined, "[Cannon] owes me the judgment, and I won the judgment." That alone does not render the transactions fraudulent.

## VI. Punitive Damages and Attorney Fees

Lastly, we affirm the district court's denial of Flanagan's request for punitive damages and attorney fees.  "Punitive damages are only appropriate when a tort is committed with 'either actual or legal malice.'"  *Wolf*, 690 N.W.2d at 893 (citation omitted).  Here, no tort occurred.  Punitive damages are thus not warranted. Similarly, attorney fees are not warranted because no conduct rose "to the level of oppression or connivance to harass or injure another."  *Id.* at 896 (citation omitted).

**AFFIRMED.**

---

[8] Flanagan's counsel at oral argument asserted that this testimony was helpful to his client's case rather than harmful, as it shows the transfers were concealed.  We respectfully disagree with this interpretation of the evidence.